IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Joseph Gaston Holden, ) | Civil Action No. 6:10-2715-RBH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed a previous application for supplemental security income ("SSI") on July 12, 2004. That application was granted at the initial level on April 1, 2005. On June 1, 2007, a determination was made that the claimant's "disability" ended on April 1, 2007. The plaintiff did not appeal that determination.

The plaintiff filed the current application for SSI benefits on July 1, 2008, alleging that he became unable to work on June 1, 2002. The application was denied initially and on reconsideration by the Social Security Administration. On December 30,

_____

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

2008, the plaintiff requested a hearing.  On August 20, 2009, the plaintiff amended his alleged disability onset date to January 23, 2009, the date he last worked.  The administrative law judge ("ALJ"), before whom the plaintiff and Carey A. Washington, Ph.D., an impartial vocational expert, appeared on December 1, 2009, considered the case *de novo* and on February 12, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on September 22, 2010.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1.  The claimant has not engaged in substantial gainful activity since January 23, 2009, the amended alleged onset date (20 C.F.R. § 416.971 *et seq.*)
>
> 2.  The claimant has the following severe impairments: migraine headaches, borderline intellectual functioning, anxiety, and depressive disorder (20 C.F.R. §  416.920(c)).
>
> 3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), and 416.926).
>
> 4.  After careful consideration of the entire record, I find  that the claimant has the residual functional capacity to sit a total of 6 out of 8 hours, stand/walk a total of 6 out of 8 hours, and lift/carry 25 pounds frequently and 50 pounds occasionally.  He has unlimited use of the upper and lower extremities for pushing and pulling as well as operation of hand and foot controls.  He is limited to occasional climbing of ramps and stairs, and balancing.  The claimant must never climb ladders, ropes, and scaffolds, and he should avoid all exposure to

unprotected heights and machinery with moving parts. He is able to frequently stoop, kneel, crouch, and crawl. He has no visual, communicative or manipulative limitations. I further find that the claimant has the mental residual functional capacity to understand, remember, and carry out short, simple, not detailed, instructions and perform routine, repetitive tasks. He is limited to occasional public contact and interaction. The claimant must not be required to read or write (20 C.F.R. § 416.967(c)).

5. The claimant has no past relevant work (20 C.F.R. § 416.965).

6. The claimant was born on May 10, 1987, and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

7. The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 1, 2008, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

5

## EVIDENCE PRESENTED

On June 11th and 30th, 2008, the plaintiff was treated with medication for migraine headaches (Tr. 374-75, 451).

Thaer A. Joudeh, M.D., examined the plaintiff at the Commissioner's request on October 7, 2008 (Tr. 382-84).  The plaintiff reported a history of seizures and headaches.  He reported that he received injections every three or four days for headaches and that a doctor told him his headaches were secondary to past drug abuse or a childhood head trauma.  He stated that his seizures did not involve loss of consciousness or tremors and that he had not taken anti-epileptic medication for three years.  The plaintiff complained of chronic dizziness and lightheadedness, chronic anxiety, depression, and weakness (Tr. 382).  He stated that he lived with his girlfriend, who took care of him, and he did not drive or work.  He spent his time watching television and playing with his dog.  He said that he finished the tenth grade but read at only the first grade level.  Dr. Joudeh found that the plaintiff was "careless" and had normal mood, below-average thought processes and content, and fair judgment (Tr. 383).  He diagnosed chronic headache, history of seizure disorder, and possible mental retardation, and found no physical disability (Tr. 384).

Donald Salmon, Ph.D., evaluated the plaintiff at the Commissioner's request on October 8, 2008.  The plaintiff reported a history of drug use (marijuana, cocaine, alcohol), drug dealing, and incarcerations (Tr. 385-390). He complained of headaches and dizziness since the age of seven, seizures, and social anxiety.  He stated that he had worked full time for only one week and had worked 10-to-15 hours per week as a laborer for about eight months.  With regard to work history, he related that he worked for McDonald's for about a week when he was 17, but left after experiencing headaches, dizziness, and difficulty with prolonged standing.  He stated that he worked part time for his brother, who was a roofer, for eight months and that the job ended when he "went back to jail" (Tr. 385-386).  With regard to daily activities, the plaintiff stated that his girlfriend took

6

care of finances and did almost all of the cooking, cleaning, and laundry, and that he did very little around the house. He stated that he had never had a bank account or driver's license and that he preferred to stay inside, away from people. He reported that he sometimes took the dog out, picked up things in the yard, and cut the lawn (Tr. 389).

Carolyn Morgan, the plaintiff's girlfriend, reported to Dr. Salmon that the plaintiff experienced headaches, back problems, and dizziness when he did "too much." She stated that he was extremely anxious, suffered panic attacks when he went out, and seemed to experience auditory and visual hallucinations. She reported that he had been diagnosed with brain damage as a result of being dropped on his head when he was 18 months old (Tr. 387).

Dr. Salmon found the plaintiff had difficulty speaking and had depressed and anxious mood, poor memory, and "quite limited" judgment. He reported that the plaintiff's intelligence tests in 1997, when the plaintiff was nine years old, revealed a Verbal IQ of 89, a Performance IQ of 66, and a Full Scale IQ of 76, and that current testing yielded a Verbal IQ of 74, a Performance IQ of 72, and a Full Scale IQ of 70. He found the plaintiff read at the second grade level and had third grade arithmetic skills. Dr. Salmon diagnosed depressive disorder with psychotic features, anxiety disorder, attention deficit hyperactivity disorder, and borderline intellectual functioning (Tr. 385, 388, 389).

The record also shows IQ testing from 1994, when the plaintiff was six years old. That testing showed a Verbal IQ of 78, Performance IQ of 90, and a Full Scale IQ of 82 (Tr. 295). Testing in 2003, when the plaintiff was 16 years old, revealed a Verbal IQ of 73, a Performance IQ of 63, and a Full Scale IQ of 66 (Tr. 348).

Steven Fass, M.D., a state agency medical consultant, assessed the plaintiff's residual functional capacity ("RFC") on November 5, 2008. Dr. Fass reported that the plaintiff had no exertional limitations, could occasionally climb ramps and stairs and balance, could never climb ladders and scaffolds, and should avoid concentrated exposure

7

to hazards (Tr. 396-403). Seham El-Ibiary, M.D., another state agency medical consultant, reported the same limitations in a physical RFC assessment dated December 18, 2008 (Tr. 439-46).

Craig Horn, Ph.D., a state agency psychological consultant, completed a Psychiatric Review Technique form concerning the plaintiff on November 13, 2008. Dr. Horn concluded that the plaintiff did not meet or equal the criteria of a listed impairment and had, as a result of an organic mental disorder, anxiety, and depression, moderate limitations in activities of daily living, social functioning, and concentration, persistence or pace, and no extended episodes of decompensation (Tr. 404-417). Dr. Horn stated that the plaintiff's psychological impairments did not preclude simple, routine tasks away from the public (Tr. 416). In a Mental RFC Assessment, Dr. Horn indicated that the plaintiff had no significant limitations in most areas of work related mental functioning, no marked limitations, and moderate limitations in the following areas: understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, and interacting appropriately with the general public (Tr. 418-20). In a Psychiatric Review Technique form and Mental RFC Assessment dated December 18, 2008, Robin Ronin, Ph.D., reported the same limitations (Tr. 425-38, 447-50).

At the hearing on December 1, 2009, the plaintiff testified that he worked picking up trash for a roofing company for about nine months in 2008 and that he sometimes earned money cutting grass. He testified that he was not currently working because he was "trying to get [his] disability checks started back" and that he was "[n]ot really" able to work. He testified that he grew tired and that his legs hurt after standing for a while (Tr. 52-53). He testified that he had pain in his lower back every day and that he could lift about 100 pounds (Tr. 56). He testified that Maxalt (for migraine headaches) was his only current medication and that he had migraine headaches, which lasted all day, three or four times a month. He testified that he did not know when he had seizures because "it

8

happens on the inside." He testified that he had auditory and visual hallucinations about every other day. He testified that he went through drug rehabilitation when he was 16 or 17 years old and had been clean and sober for about five years (Tr. 54-57).

The plaintiff further testified that in school he was in classes for students with learning disabilities and that his education was interrupted by an incarceration for burglary (Tr. 59-60). He testified that he did not have a driver's license because he did not read well enough to study the manual and that he had difficulty using public transportation. He testified that he was incarcerated from September 2007 to April 2008 for giving false information to the police and in early 2007 for possession of marijuana. He testified that he last sold illegal drugs when he was 18 or 19 years old (Tr. 61-63). He testified that he usually watched television and helped feed the dog during the day, washed dishes occasionally, and did a little vacuuming (Tr. 55, 64). He testified that he went to the grocery store sometimes but did not like big crowds of people (Tr. 59).

The ALJ asked Carey Washington, Ph.D., a vocational expert, to consider a person the same age as the plaintiff with the same education and work experience who could:

> • lift and carry 50 pounds occasionally and 25 pounds frequently;
> • stand or walk for six hours and sit for six hours in an eight-hour day;
> • occasionally climb ramps and stairs and balance;
> • frequently stoop, kneel, crouch, and crawl;
> • follow short, simple, but not detailed instructions;
> • perform routine, repetitive tasks;
> • not tolerate exposure to unprotected heights and machinery with moving parts;
> and,
> • not perform work with a reading or writing requirement.

(Tr. 68). Dr. Washington testified that such a person could work as a cleaner in a hospital, park worker, and dining room attendant/bus person. He testified that those jobs were described in the *Dictionary of Occupational Titles (DOT)* as requiring level-two reasoning, but that based on his professional training, experience, and observation of the jobs, he found they required level-one reasoning (Tr. 68-70).

## ANALYSIS

The plaintiff was 21 years on his alleged disability onset date. He completed the ninth grade in school. The ALJ found that the plaintiff had the following severe impairments: migraines, borderline intellectual functioning, anxiety, and depressive disorder. She further determined that the plaintiff had no past relevant work, but would be able to perform jobs that exist in significant numbers in the national economy, including such work as a cleaner in a hospital, park worker, and dining room attendant. The plaintiff argues that the ALJ erred by (1) demanding a formal diagnosis of mental retardation instead of applying the capsule definition in Listing 12.05C; (2) failing to apply the "special technique" for the assessment of mental conditions with regard to his anxiety and depressive disorder; and (3) failing to resolve the conflict between the vocational expert's testimony and the *Dictionary of Occupational Titles* ("DOT").

### Listing 12.05C

The plaintiff first argues that the ALJ erred by failing to find that he met Listing 12.05. In order to meet any of the subsections of Listing 12.05, entitled "Mental retardation," a claimant must meet the "capsule definition" of mental retardation set forth in the introduction of the listing. As one court has explained, all of the listings for mental disorders have "the format of a capsule definition of the mental impairment followed by a listing of the symptoms required before the impairment itself would be considered severe enough to preclude any gainful employment, without the need to consider a claimant's remaining functional capacity." *In re Petition of Sullivan*, 904 F.2d 826, 835 (3rd Cir. 1990).

10

6

A claimant must meet the capsule definition for the listed mental impairment as well as the

severity requirements in order to meet the listing. *Id*. at 841, 845-46.  Listing 12.05 provides

as follows, in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied....
>
> C. a valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.  Accordingly,

> In order to qualify for a finding of impairment under 12.05C, Plaintiff must satisfy three requirements: (1) a valid IQ score between 60 and 70; (2) a physical or other mental impairment imposing additional and significant work-related limitation of function; and (3) deficits in adaptive functioning initially manifested during the developmental period (onset before age 22).

*Gooding v. Astrue*, 6:08-855-CMC-WMC, 2009 WL 1956694, at *2 (D.S.C. 2009).

> The ALJ found as follows as step three of the sequential evaluation process:
>
> Counsel contends that the claimant has a combination of impairments that meets the requirements of section 12.05C of the Listing of Impairments.  A consulting psychologist and a State agency psychologist concluded that the claimant has borderline intellectual functioning, not mental retardation, based on remote and current Intelligence Quotient test results and adaptive functioning (Exhibits 8F, 11F).  These expert opinions are afforded significant weight.
>
> Accordingly, I find that the claimant does not have significant subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.  Therefore, he does not meet the requirements of section 12.05C.

(Tr. 13).

The plaintiff argues that the ALJ erred by requiring a formal diagnosis of mental retardation instead of applying the capsule definition in the listing. This court agrees. The ALJ failed to evaluate whether the plaintiff met the requirements of the listing, relying instead, without discussion, on the assessments of non-examining physicians. The plaintiff has consistently had Verbal, Performance, or Full Scale IQ scores between 60 and 70: testing when the plaintiff was nine years old revealed a Performance IQ of 66 (Tr. 281); testing when he was 16 years old revealed a Performance IQ of 63 and a Full Scale IQ of 66 (Tr. 348); and testing when he was 21 years old revealed a Full Scale IQ of 70 (Tr. 388). However, the ALJ did not discuss these IQ scores in her decision. Furthermore, the ALJ found that the plaintiff's migraine headaches, anxiety, and depressive disorder were all severe impairments but did not discuss whether the plaintiff had "a physical or other mental impairment imposing an additional and significant work-related limitation of function" so as to satisfy the second requirement of the listing.

Lastly, the ALJ did not analyze whether the plaintiff had deficits in adaptive functioning. Instead, the ALJ simply referenced the assessments of two non-examining physicians, Drs. Horn and Ronin, and gave them significant weight without evaluating those opinions (Tr. 13). Dr. Horn found as follows:

> CT is not MR given old testing and present testing of FS70; has driver's lic; can do simple tasks. CPP dec primarily by physical factors. Current social anx may be primarily due to having a warrant out for him; he has hx of dealing drugs which requires getting out and interacting with others.

(Tr. 416). Dr. Ronin made similar findings (Tr. 437).

As argued by the plaintiff, the two opinions relied upon by the ALJ appear to have flaws: (1) there is no discussion of the plaintiff's history of IQ testing showing scores of 70 or below; (2) there is no evidence that the plaintiff had a driver's license, and he

12

testified that he had never had one (Tr. 51); (3) there is no explanation of the conclusion that concentration, persistence and pace were listed primarily by physical factors; (4) there is no explanation of the conclusion that the plaintiff's social anxiety was primarily due to having a pending warrant[2]; and (5) there is no evidence that the plaintiff dealt drugs during the period at issue.[3]

Based upon the foregoing, upon remand, the ALJ should be instructed to evaluate whether the plaintiff's mental condition satisfies the requirements of Listing 12.05C. To the extent the ALJ adopts the opinions of State agency psychological consultants, she should evaluate those opinions in accordance with Social Security Ruling ("SSR") 96-6p, 1996 WL 374180 (S.S.A.).

### Depression and Anxiety

The plaintiff next argues that the ALJ erred by failing to apply the "special technique" for the assessment of mental conditions with regard to his depression and anxiety. The special technique requires the adjudicator to rate the degree of functional limitations resulting from mental impairments in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a. As noted by the Commissioner, the ALJ did rate the degree of the plaintiff's functional limitations in these areas, albeit at the step four of the sequential evaluation process, finding as follows:

> I further find that the claimant's anxiety and depression result in mild restriction in activities of daily living, moderate restriction in maintaining social function, and moderate restriction in maintaining concentration, persistence and pace. The evidence

---

[2]According to the history the plaintiff gave Dr. Salmon in October 2008, he went to jail in September 2007 for a probation violation. He was released in April 2008, prior to his alleged onset date (Tr. 386).

[3]According to the history the plaintiff gave Dr. Salmon, the last time he sold drugs was at age 19, prior to his alleged onset date (Tr. 386).

does not show that the claimant has had episodes of decompensation, each of lasting duration.

(Tr. 16). As this court recommends that the decision be remanded for further consideration of Listing 12.05C at step three of the sequential evaluation, the ALJ should be further instructed to apply the special technique with regard to the plaintiff's anxiety and depression at step three.

### Vocational Expert Testimony Conflict

Lastly, the plaintiff argues that the ALJ erred in failing to comply with SSR 00-4p, which provides in pertinent part:

> When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the [Dictionary of Occupational Titles ("DOT")]. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4.

Here, in the hypothetical question to the vocational expert at the hearing, the ALJ limited the hypothetical individual to following "short simple but not detailed instructions" (Tr. 68). The vocational expert testified that the jobs he identified in response to the ALJ's hypothetical question — cleaner in a hospital, park worker, and diningroom attendant/bus

14

person — were described in the DOT as requiring level-two reasoning (Tr. 69).  The plaintiff's attorney then pointed out that the DOT defines level-two reasoning as requiring the worker to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions" (Tr. 69) (quoting DOT, App. C, Components of the Definition Trailer (4th ed. 1991), *available at* 1991 WL 688702).  When the ALJ asked the vocational expert whether there were jobs that required level-one reasoning "that would fit the hypothetical presented," the vocational expert responded, as follows:

> Well, in my opinion from what I've seen of the jobs that I've mentioned to you, Your Honor, I believe those are. And although it may be in conflict with the Dictionary of Occupational Titles but I believe from what I have seen those are reasoning level one jobs.

(Tr. 70).

In her decision, the ALJ did not explain how she resolved the apparent conflict between the vocational expert's testimony and the DOT, and she erroneously stated that the vocational expert's testimony was consistent with the DOT (Tr. 17).  Upon remand, the ALJ should be instructed to comply with SSR 00-4p as discussed above.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/ Kevin F. McDonald
United States Magistrate Judge

January 6, 2012
Greenville, South Carolina

15